Okay, Ms. Alito, hello to you first of all and whenever you're ready we can proceed. Thank you, Judge. This is a summary judgment case in which the district court dismissed Care One's case without addressing key evidence that created material issues of fact on the union's objectives, extortionate intent, and intent to defraud. I'd like to start by pointing out nine of the most May 2009 email between the International and the Connecticut locals stated that Care One had been flagged as a potential campaign target based on data mining of Medicare statistics aimed at finding employers with perceived weaknesses that could be used as leverage in a campaign. This was long before any alleged unfair labor practices. It was before any issues in collective bargaining. It was a classic extortionate plan to find a target with a weakness and exploit it. This was not mentioned. Let's stop right there, all right? I know you got nine things to get to, but we got limited time. Sure. Overall nine. And you've started with a matter which was sort of at the top of my list too. Why is it that the decision that you emphasize, and assume it's true, that the SEIU and the related unions decided we're going to go after Care One, this suite of healthcare companies? Is there something extortionate or wrongful in a union saying, I think this company is ripe for pressure? We can put the hurt on them and they'll come to the table. Is that unlawful? It is, if it's done the way it was done here, your honor. That's the point, right? So when you start and say, well, they picked this company, so what? They picked this company. The question is, is what they did then unlawful? And I want to focus you on that Norris LaGuardia point, which you say, well, it doesn't have anything to do with this because it's, you know, we're in Rico land. What is your authority for the argument that when the Norris LaGuardia says very clearly, no member of the union is going to be held responsible or liable for unlawful acts of any individual person who's in the union, except upon clear proof of actual participants. Why should that be jettisoned? Because we're in Rico land. Well, your honor, first, that argument applies only to the question of the medical sabotage. The other acts of extortion were acts that were clearly authorized by the union. So I gotcha. But answer that question for us, please. Well, I think that under the second circuit's decision that we cited in our brief, saying that where the Rico statute collided with the Norris LaGuardia act, that the court in that instance decided that the standard of proof that Rico prevailed. What's your best case that any of this conduct was wrongful as intended under the extortion statutes? Well, Judge, doesn't Edmonds go directly against you saying even violence is all right, if there's a claim of right. And the claim of right here was the union pursuing, you know, labor negotiation, pursuing collective bargaining, pursuing having this, these companies brought to the table, basically. So what's your best case to say, uh-uh, this is beyond the pale? Oh, okay. May I start with Edmonds? Because, your honor, because I think that Edmonds dealt specifically with the question of strike violence under the Hobbs Act. We have not asserted a Hobbs Act claim in this case. We've asserted state law. Well, what is the difference between Hobbs and state law? Yeah, I don't see a difference either. Help me out with that. Certainly. The Edmonds decision applies specifically to the Hobbs Act. If we look as to see what is extortionate under the state law statutes, we look to the model penal code and the specific state law statutes in question. Now, the district court, in deciding that this was not that it intended to create a law that would change the state law extortion statutes. What you're being asked is, what's the difference? Yeah, what's the difference? What's the delta that you're pointing us to between the pertinent state law extortion laws and the general Hobbs Act definition? Certainly. The state law extortion statutes don't create an exemption for unions under the saying that they're pursuing legitimate collective bargaining. But you still have to have obtaining property from another with consent induced by wrongful use of actual or threatened force of violence or fear under color of official right. I don't see a big difference between that and Hobbs Act. You're saying there's a specific statutory exemption in the Hobbs Act that makes it irrelevant here. That's right, Your Honor, because without the Hobbs Act, then we look at the union's behavior as we would any other corporation. If we look to brokerage concepts and we look to Tobin, the union's conduct in this case is directly parallel to the conduct that was found to be extortionate by this court. In Tobin, in that case, the defendant claimed that she had an oral contract to represent the band under the guise of what she said was enforcement of this oral contract. She engaged in a campaign of harassment, of sending messages, of saying the band is dead, of getting places to the labor situation. This is pretty extreme. Are you saying we have the same thing here as in Tobin? I think we have something parallel here as in Tobin. It's certainly not like brokerage concepts, and brokerage concepts was a routine business transaction in which the defendant said, you can't be in our network unless you also use our pharmacy administrator. That's very different. Did the claim of right defense apply in that circumstance, in brokerage concepts? Yes. Let me ask you this further question then. If the claim of right defense was operative in that business-to-business, not union transaction, what difference does it make that here the Hobbs Act doesn't apply and so the union exception doesn't apply? If the claim of right defense is going to be the same in both, what does it matter whether we're talking about the Hobbs Act generic definition or the state law definition that you're pressing? Okay. First, the court in brokerage concepts declined to establish a general rule and said its holding was very specific to the facts of that case. In the facts of that case, there was nothing like we've seen here. The defendant- I got a problem. Ms. Alito has just frozen on my screen, Greg. I don't know whether the others are having this issue or not. She's not frozen on you. I can also. Yeah, now it looks like Judge Jordan, this is Greg. Judge Jordan, if you can hear me, I wonder if you may get better experience if we disconnect and reconnect. This is not on your time, Ms. Alito. Once we get this resolved. Thank you. Thank you, Judge. Judges, I'm going to go ahead and- all right, it looks like Judge Jordan just did that. All right, let's sit tight while he reconnects. He's going to appear here just a bit. Is he on the court's laptop or his own computer? I believe he's using an iPad, Judge. Greg, what's your phone number? If something like this happens, I could reach out. My cell phone number is 215-439-4897. 4-3-what? 5-4-8-9-7. It's 439-4897. I'm going to get in touch with Judge Jordan. Okay. Well, this is surprising. We had, I think I mentioned during our meeting, it was before the council, we had an oral argument in July with the pro se litigants who participated on Zoom from Pakistan, and it was flawless. It was perfectly clear, good sound, nothing froze. We stay local, bad things happen. Maybe if we can't get his video, we can just get him on by phone. Yeah, that would work. Ms. Lito, is that a virtual background you have, or is that the color of your wall? It's the wall in my office conference room, Judge. Because usually, it looks like a virtual background is so flawless, but usually you get that greenish kind of pixelation happening. All right. I do have Judge Jordan back. Yeah. And spring for a good computer. Stop being so damn cheap. Throw me out, but it's never been quite this obvious before that I wasn't on it. It's a new day. Yeah. Brokerage concepts, bad things happened. Yeah, my eyes are open. I lost you. Let me tell you, you were answering our question, and I lost you right at the point where you were explaining your position on why there is a meaningful difference between state law and Hobbs Act extortion for purposes of this RICO discussion in light of brokerage concepts having applied the claim of right defense in a non-union setting. That's where we were. Yes. And excuse me if I'm repeating myself, but the court in brokerage concepts in applying a variation of the claim of right defense said it was not establishing a general rule, that it was dealing with a very fact-specific situation, and each situation needed to be Now, we have very different facts here. First, because the unions have admitted that obtaining a collective bargaining agreement was not their only goal here. The union official Ramos testified that the purpose of actions taken in Puerto Rico was to harm an unrelated business there. The union admitted that it had the goal of putting appellants into receivership and running them out of the state of Connecticut. A union employee stated that New Jersey locals' goal was to destroy Carowind and bring it to its knees. These are not normal business transactions as in brokerage concepts. And, Judge, when we talk about the claim of right. I'm going to take you back to Norris LaGuardia for a second because we jumped off of it. You pointed to the second circuit case, local 1814 case. But they said very specifically, we're deciding a narrow question here, and that is whether that 60-year-old general prohibition against injunctions in labor disputes will bar relief in a case like this. They said no. They weren't talking at all to Section 6. That seems to be meaningful when you're talking about the most extreme of the things. It seems to me that you think it's the most extreme. You put it front and center, which is the sabotage. Aren't you stretching that 1814 case past its own narrow holding? I don't believe so, Your Honor. I believe that under the RICO statutes, the unions need to be treated like any other defendant. Except they're not because of the agency requirement, though. And that's clear. It couldn't be clearer in Section 6. There's an agency requirement. That's different than any other defendant. Maybe you didn't mean to speak that broadly. Yeah, it's a statutory statement that says, it doesn't say every place except RICO. It says if you're going to go after a union person and stay there involved in bad stuff, you better have clear and convincing evidence that they were involved. And that it's a union. Yeah. Well, I think we do have substantial evidence that the union was involved, that the union authorized the acts of sabotage. There was a question of fact under whatever standard is applied. But, Judge, may I, before I respond to that question, I did want to wrap up on your question about generic extortion and wrongfulness, because I think that's very important. And I wanted to make sure that my entire argument was there. I talked about the evidence of the union having improper motives. And then talk about what the union says is a claim of right defense. If we look at any of the state law statutes, what the union says is its claim of right here, doesn't fall within any of them. The union was not claiming money that was its, under all of those statutes. They say they were, right? They say all the pressure campaigns, everything we were doing, you might find it obnoxious. You might find it bad behavior, not polite. But our job is to get better wages and benefits for our people. And we're allowed to do what we need to do within the bounds of the law. We can't extort, but we can go picket. We can put a giant inflatable rat outside your business. We can leaflet. We can tell the world you're a dirtbag. We're allowed to do that. Have you heard of it?  But it's not, Your Honor. I think when we look at the claim of right defense under state laws, it has to be property to which you have a right. The union has no right to better benefits or to increased salary. What we're talking about here is not parallel to an employee saying, employer, you haven't paid me wages that I earned. What we have here is an employee going to the employer and saying, I want a raise. Well, that's right. That's a dramatic thing you're saying. Because by that logic, anytime people are engaged in a collective bargaining agreement negotiation, you're saying it's got to be kid gloves. They can't get tough. They can't get hard-nosed the way they can. I mean, are you actually making a distinction between, wait a second, you withheld benefits and, wait a second, we want better benefits, that that's the legal line between whether they can engage in the kind of pressure tactics we're talking about? That's the legal line in determining whether a claim of right defense applies under the Model Penal Code and under the three state statutes that we rely on. And we're not at all saying that the union can't get tough. What we're saying is that the union can't come to us and say, you know, we're going to block your putting in new air conditioning in your facilities at Massachusetts where we don't represent any employees, where we're not trying to organize. We're going to block that unless you give us neutrality and you agree to our terms. That's not being tough. That's crossing the line into extortion, Your Honor. And I would say the same. Can you have rights there? Do you have rights to, under state law, to, I mean, maybe the better way to ask this is, at that point, are you pulling us into what Mr. Diane has said in the briefing is a First Amendment morass because we're talking about rights to petition and rights of free speech? No, not at all, Your Honor. Why not? Why not? The union's site, United States versus Alvarez, which specifically says that fraudulent statements and statements that are integral to committing a crime are exempt from First Amendment coverage. And we're not talking— Leave the fraudulent piece out because that's adding your spin on something. And maybe it's right, maybe it's not. Just talk about—assume we weren't going to get into characterizing it as fraud. Just talk about why, on a First Amendment right to petition, right to free speech basis, your invitation to make the distinction you're making here would involve us in having to address those constitutional issues. Statements that are made for the purpose of extortion are not protected by the First Amendment because they're statements that are integral to committing a crime. That's assuming the answer. That's assuming the answer. It doesn't advance it to say statements that are made for extortion. That's what we're trying to deal with right now is whether this is extortion. Well, Your Honor, perhaps some misunderstanding, but if the union comes to my agent, which we contend that it did, and says, we'll drop our 10 taxpayer petitions in Massachusetts that were designed to block your fiscal improvements. We'll drop them if you agree to neutrality and you agree to our collective bargaining demands. That's an extortionate threat under Massachusetts law and under the Model Penal Code, which says— even the district court seemed to agree with you on that, right? But said, that's not admissible evidence. So you can't rely on that here and I can't rely on it in your summary judgment context. Wasn't that the problem there? The district court erred in saying that that was an admissible hearsay. How so? That statement should be admitted as a reported recollection. The unions have stated that the court shouldn't entertain that because we argued party admission below. But exactly what was argued, and this is very important, we stated, it is not an admissible hearsay, but a party admission under federal rule of evidence 801D2 truthfully documented in an email from plaintiff's representative. Yeah, but you never cited 803.5. If you don't cite the rule that you're relying on, isn't that a problem? We cited the substance of that argument by saying it was truthfully documented in an email from plaintiff's representative. And I think under this court's decision in Triumph Group v. Sharpe, it is a closely related argument that can be considered on appeal. Moreover, other further evidence of that extortionate threat, which the district court did not mention, is internal emails between union employees, James McGregor and Elizabeth Daley, that also express the very similar threat. It's worded differently, but it's in their emails. That's clearly admissible evidence of the extortionate threat. And when deposed, Ms. Daley's only explanation for those emails to say they were facetious and a joke. Your Honor, that's a jury question. What did those remind us what those emails said? Our demands are a pretty high bar for something like this. If they're willing to bargain in good faith with Connecticut workers and give workers throughout the rest of the company a fair opportunity to organize, then yeah, we'd be willing to let them move forward. I don't think that's going to happen here. And that was in response to an email from Elizabeth Daley saying, I called him back. He again says that having these TTGs, delays making these important renovations, will benefit the workers and residents of the Concord and Lexington homes and wouldn't be willing to withdraw them. Is there anything specific that they could do to get us to withdraw them? I said I would get back to him. James, do we have any demands? And then the response is in part what I just quoted. And this is an appendix 2563 and 2564. So not only do we have the gated email that records that conversation, we have those internal emails specifically referring to making that threat to CARE 1. Was that raised in the district court? You're arguing you raised an argument sufficiently analogous to it to a prescription on appeals, I recall. Is that right? We did raise the argument with regard to the internal emails as another, as other evidence. We specifically argued that. Which is with the one that was the history problem was the Daley email then? Yes, the admissibility argument was the Daley email where we cited 801T2, but also said it was truthfully documented in an email from plaintiffs' representative. And I think, Judge, in this context that we also have an implicit extortionate threat with regard to the letter trying to get CARE 1 indicted. The president of the Connecticut union specifically said in his deposition, I asked him, did you want to get an indictment and conviction? Of course we did. And you thought that would help your cause? Of course we did. Amy Gladstein, a lawyer, employee of the union, testified and said in her declaration that the purpose of getting the investigation of CARE 1 and criminal charges was to gain leverage in collective bargaining. This is not, Your Honors, normal behavior. This is extortionate behavior. And where does the extortionate intent come on the letter to then Attorney General and Inspector General and others? Where do they have a good faith belief that there is criminal activity there? Does that change anything? If they have a good faith belief that there is something going on, we're willing to close our eyes to it. You'll kind of see us halfway at the bargaining table. I think the answer to that is twofold. Is that a threat to accuse someone of criminal behavior is extortionate, even if the person is guilty of that behavior. And I believe we cited a case for that in our brief. Hold on just a minute, Ms. Alito. But what if they're, unlike the other sites, other examples you've cited, there's no suggestion that they're going to withdraw that. There's no suggestion that this is something they're bargaining with, but they think there's Medicare fraud here and they're reporting it. They're not looking to bargain with it. They're just public-spirited citizens who want to see Medicare fraud stamped out. Two-part answer to that, Your Honor. Both parts are important. The first one is, why did they specifically ask that the senator send a CC to Daniel Strauss, one of the owners of the company? The initial draft of the- He's the CEO. He's the CEO of the company. If you're just a good public citizen and you're reporting this wrongdoing, you're not going to care whether a copy of it goes to the company or not. They wanted to put him on notice of what was going to happen if they didn't give in. And this, Your Honors, is what brings us back to that initial email that I mentioned and makes it critically important. This all started before there were any problems when the union said, hey, we've been searching through CMS's database and we've identified companies whose statistics might allow us to make a claim with Medicare billing fraud. That makes them good targets for a campaign. So that extortionate intent is seen from the get-go. They picked us because they thought they could do this. And this was the union's pattern. They've done this with multiple other employers of saying, not as a general matter, as whistleblowers, but when they're in a dispute with an employer, they make allegations of Medicare billing fraud. That's the pattern of conduct. And that is clearly extortionate. And I think that that, coupled with the specific extortionate threat with regard to the 10 taxpayers. Now, I'm talking about- You're way over your time here. I'm sorry. And that doesn't include the amount of time. You did not reserve rebuttals. I kind of let you go a bit. But as you probably know, we don't usually ride the clock too much. But let me just take a minute, not an advocate's minute, but a real minute by the clock, and just kind of wrap up your argument. What do you think we should keep foremost in our minds? Yes, I think the district- And Judge, I did mean to reserve a few minutes for rebuttal. And hopefully, I can have a few minutes. Well, if you're appointed, we'll consent to it, okay. But usually, if we don't reserve it, and you're an incredibly experienced counsel, I assumed it was deliberate that you did not reserve it. If counsel will agree to it, fine. Otherwise, we'll take that as forfeited. Well, Your Honor, it was the way the argument began, and it being virtual, that I jumped right in. It's a different world. It's a different world. When you said, Ms. Alito, and I respectfully request that I be given a few minutes to sum up in rebuttal. I think it's very important that we be given- That we be given that opportunity. Take some time now and just wrap up your argument. And let me think this through. Go ahead. Okay. There were clear questions of fact that the district court didn't mention. The district court's opinion fails to mention any of the facts that were favorable to the plaintiffs with regard to intent. We didn't touch on mail and wire fraud. There were questions of fact of intent to deceive on mail and wire fraud, where the district court credited declarations that were made and ignored the deposition testimony of Ms. Gladstein, a senior employee of the union who testified that no such vetting procedure was in place. The district court erred in holding that there was no generic extortion and failing to look at the state laws. As this court held in Agnes, Edmonds was specifically limited to the situation of strike violence. The Edmonds court made it clear that it was not by its decision changing state law. It said we're not- Briefly, do you- We understand the Edmonds argument and your brief is excellent. So why don't we hear from Mr. Dionne. If there's something that you really feel you would need to communicate, you didn't get a chance to communicate to us today, why don't you send us a 28J letter and we'll certainly consider that. Thank you, Judge. Thank you very much. Mr. Dionne or Dayan? Dionne is good. Go ahead, sir. Good morning. This case represents an attempt by CARE 1 to introduce federal felony criminal laws into the field of labor management relations. Despite the fact that this has been an area that Congress- But you're not suggesting, there are unique considerations in the area of labor relations that deal with the tension inherent in the bargaining parties, but you're not suggesting that labor unions are somehow immune from the reach of federal labor, federal criminal laws like extortion and mail fraud and wire fraud, are you? No, no, not at all. Our suggestion is only that the conduct here, as I think was alluded to by Judge Jordan, is core labor management relations conduct. The objectives here were labor management goals. Well, please don't misunderstand anything I said as implying a conclusion. I'm just asking questions, and I got one for you, which comes right out of Ms. Alito's closing there. How is it not a jury question whether or not a union who picks a target because they think they can bring a criminal threat against them is not something that we should be sending back and saying, hey, whether they had that kind of bad intent or not is something for the jury to decide, because if they did have that kind of intent, if that was their aim, to leverage the criminal system against the company to extract labor concessions, that's extortion. Why isn't there at least a fact question there? You agree with that, Mr. Dian, first of all, and then that it would be extortion if that was their intent. Do I agree with? Criminal extortion, if that was their intent. Well, my answer is that for there to be extortion through assertion of allegations or seeking an investigation against another party, under every test put forward, there has to be a threat. And in this case, the record is crystal clear, there is no dispute about this, that the unions never threatened Care One with any criminal accusation or with any... Stop a second. When you say that's crystal clear, I'm just speaking for myself. It's not crystal clear to me that when a union sends a letter to a U.S. senator and says we want this to go to the Department of Health and to the U.S. Department of Justice because these guys are engaged in fraud, in Medicare fraud, that's far from crystal clear to me that that is not- You see the chief of the company. The CEO, that that is not something that is a threat to leverage the criminal system. Why do you think that's crystal clear? Well, what's clear is that there was no effort. In every extortion case of this type that the plaintiffs can cite or that anyone can cite, the person who is reporting wrongdoing has offered to withhold that report in exchange for consideration. Okay, well then are you acknowledging that if one went and said, look, I could bring the authorities down on you for Medicare fraud, but I'm not willing to do that if we can talk about wages and benefits. Are you agreeing that that would be extortionate? That would meet the wrongful use test of extortion under the model penal code. Absolutely. Why can't the threat be implicit instead of explicit? Because what you seem to be saying is unless they say it, it's not a threat. Why can't there be an implicit threat as well as an explicit one and still be extortion? And why wouldn't that be a jury question? When the underlying conduct that is engaged in without a threat, so- Well, the rabbit just went in the hat. Yeah, yeah. The rabbit just went in the hat. The question is, why can't a threat be implicit as well as explicit and then be presented to the jury to decide I think that's a threat or not? It can't be as a matter of law, an implicit threat when the only conduct is making the constitutionally protected report. Otherwise, as we showed in our brief, you would have an extraordinary chilling effect on the First Amendment right to petition. Well, you know, Norah Pennington has not, I don't think, been mentioned here, but I kept thinking of that as I read through the briefs. Is Norah Pennington implicated in any way here? It would absolutely be, which is why we stated that if you follow these sort of basic extortion principles from the model penal code and brokerage concepts, you don't have to get to the issue, but you absolutely would have to get to the issue. And then if you did get to that issue, you'd be in front of a jury or at least in front of a judge arguing sham litigation, right? It's sham. In fact, that's not what they would be saying. That's what they are saying, that this purported exercise of right to petition, et cetera, was a sham all designed to do them harm and injury. But again, why are those things which involve questions, both objective and subjective, not particularly when you get the subjective part, issues for juries to decide. Yeah, so there is no jury question here because the definition of sham litigation or a sham petition is one that the petitioner does not believe has a chance of succeeding on its own merits. Well, you know, it's more than that. What if it's stolen? Go ahead, Judge Rendell, go ahead. I have a question about claim of right. Your assertion is that claim of right means all's fair as long as it's tied to a labor dispute. And I'm looking at these posters against Mr. Strauss, you know, wanted, proclamation of the sheriff, wanted for corporate greed and robbing workers of their rights. Couldn't a jury look at these types of things and say, okay, you say it's claim of right because you're going for a labor dispute, but you're really trying to put pressure on this man in a way that's just, that's not right, if you will. I mean, shouldn't a jury look at whether claim of right really allows everything to be off the table, if you will? Because that seems to be your argument, that once you say, aha, I've tied it to a labor dispute, I can do whatever I want, you're home free. Well, there's two responses to that. First is that that is the model penal code analysis, which the plaintiffs themselves, you know, sort of put forward as the proper analysis. That's point one. Point two is that even on a more restricted test of claim of right than the model penal code test, which is the test I understand the plaintiffs to be advocating here, the only, what would make conduct like that potentially extortionate would be if there were no link to the, you know, to the collective bargaining objective. But you're not pointing to any link, and that's where shouldn't a jury find whether the link is so tenuous as to not be credible. You know, you tie it, but what are they trying to get out of this by all of this, you know, these aspersions? Shouldn't a jury be given the task of deciding whether the link is genuine or whether it's, you know, a sham or, you know, just so tenuous that it's not really real. Well, first of all, the crime of extortion is a very specific subset of theft crimes that carries with it a 20 year penalty. This was part of the reasoning of the Supreme Court in Edmonds, where, of course, the court said that violent in pursuit of a collective bargaining objective was not something that Congress intended to bring criminal law into. So there are other remedies for wrongful conduct. And this is what Judge O'Scanlan said in the UBC opinion, which is directly on point. And I would urge the court to follow it. Well, we've looked at UBC and Judge O'Scanlan is a brilliant jurist, but it might not be exactly on point. Did UBC involve a union attacking the CEO of the company by going and saying, hey, he's got no right to be involved in philanthropic things because he's a dirtbag. Throw him off this board. Did it involve going to a U.S. territory and addressing businesses that have nothing to do with the union, nothing to do with health care issues that they're dealing with? And attacking them? I mean, those things weren't in UBC, were they? In UBC, I believe, in UBC, one of the representatives or supporters of the Carpenters campaign, you know, said that the head of the Carpenters was someone who, I mean, you know, who should be basically run out of town on a rail and hung from the highest tree. The court properly found that that was, you know, protected speech because it wasn't a real threat. But absolutely, this... So they can do anything to this Strauss guy. They can do anything to him because he's the CEO and it's OK because it's a labor dispute. There is a limit and the limit is in the brokerage concepts line of cases. The limit is that where the threat is of pure economic pressure, where that's what's going on, then other than tort law can take care of any, you know, defamatory or harassing speech. Well, that's no limit at all because it's all designed as economic pressure. By definition, I guess you're saying short of breaking the guy's ankles, you can do anything because it's all designed to bring the union, to bring the care one people to the bargaining table in a weakened state. By their own admission. That's the point. The point is, I mean, I can read you excerpts from the deposition, but you've seen him too. His personal philanthropic activities was an effective pressure point. Yes, I think I was saying again, there was an affiliation that he had. They were working to get his business to operate differently and make a different decision. And messing with Strauss was an effective pressure point. Yeah, but I don't know what you mean by messing with. I mean, of course, they knew what they were doing. It's as clear as a bell. They knew what they were doing. So what you're saying is pretty nice reputation you have there. A shame if something happened to it. And that's OK. Well, let's take, I think you need to break down the question into the, into what was actually done here. So there was part of the question. In terms of going after his reputation. Yeah, there was no threat. And this is a distinction made in the model penal code in the cases. There was no threat to reveal personal secrets, which is in a different category, as we pointed out in our brief. All that was being done was publicizing his labor record. And there was a long track record of labor violations. So the communications about Mr. Strauss at NYU are within the core of what even the plaintiff's restricted view of extortion permits. Because the message of those communications was this gentleman, Mr. Strauss, is a repeat labor law violator. What is, how about, how about his economic interests in a development in Manhattan? And how about his businesses in Puerto Rico or those labor related things? The message, the message that was being, the message that was used with respect to the business development was this person is a labor law violator. So the message had a direct access to the goals. Anything you tie is OK. I'm sorry. Go ahead, Judge. Can the jury decide what's the message? I mean, when they're saying 99% of Americans are struggling, but Daniel Strauss isn't, you know, he has $95 million. And then the tagline is, oh, by the way, you know, he violates workers rights. Shouldn't a jury decide that this is, quote unquote, economic pressure or whether it's other kinds of pressure and whether this is covered by claim of right? I mean, these are things, you know, the district court said this is not wrongful and that relies on claim of right and economic pressure. And we're just wondering whether the district court really should have just said, oh, you know, definitely, you know, close the door on this or the jury should look. I mean, there's a paucity of case law since Edmonds that, that really talks about these kinds of things and the nature of this pressure. And I find this case to be distinguishable from some of the cases that have said, you know, that, you know, it's fine. And even Edmonds, you know, there was some property destruction. It's not personal, you know, attacks ad hominem attacks against people that they really can't defend. So the question is, why shouldn't a jury decide? Well, when you, when, when the, when the attack is against a person who is running a corporation that is violating labor law, I mean, the jury shouldn't decide because this is where the first amendment truly is implicated on a, on a proper reading of the claim of right, where these questions are questions of law. You don't have to worry about the first amendment implications because you don't, you're not close to, to wrongful means. But if you were to go, if you were to go in that direction, you would have the prospect that a jury could, could put someone in jail because this, their theory has to apply to the criminal law and not just to a civil case. The, the idea that you would put someone in jail for 20 years for saying this person who is sponsored an institute of law and justice may be a hypocrite because his companies are violating labor law. That would be. Well, I don't think, I don't think you would be putting somebody in jail for 20 years for that Mr. Day. And that gets into a whole series of questions about proof beyond a reasonable doubt. And sentencing guidelines and things like that, which are just not in front of us. I don't think you have to pull your, you don't have to push your first amendment argument that hard. You know, you've, you've got a decent first amendment argument, which is don't weigh into this. You can avoid this constitutionally, but that, that feels like you're, like you're pushing that a little too hard. My real question, and I think you're hearing this from all of us right now is there was a, when you say you, the jury should never see this. What it really feels like you're saying is there is, there's virtually nothing a union can do that is not okay. As long as there's a labor dispute, it can start by looking for somebody that it wants to use a criminal threat against. It can actually make a threat about criminal prosecution by, by making referrals. If you, if you assume that there's an implicit threat there, it can foul up unrelated regulatory issues and put people in residence that they don't have anything to do with at risk by holding up necessary improvements to buildings. It can trash the personal reputation of a business person. It can do all those things. And because it's in the context of a business, a labor dispute, it's all good. It's all good. And don't mess with us because we got the first amendment on our side. That's the, that's the position that Ms. Alito was putting to us. And I, I'm curious to know why. Why is that wrong? What is wrong with that, that approach to us? There are limits and you don't have to, go as far as the model penal code would go. I want to be very clear about this. You do not have to go as far as the model penal code and say that there would be a claim of right for all of this. That would be a proper defense in order to rule for us. You simply would have to follow brokerage concept and the UBC case. And let me explain why. There was no, because the way that the union proceeded with respect to the Blumenthal letter was, and the testimony is clear on this, was to bring the allegation first and not offer to withhold anything. And there's no proof that it was ever bargainable or negotiable. So you do not have to go that far to say that a union could actually threaten a report and offer to withhold it in exchange for consideration in order to rule for our side and to affirm Judge Wiginton in this case. She properly found that on the record, you couldn't find such a threat. Well, you couldn't find an explicit threat, but now we're just back to the question I asked before. Why can't you make an argument? Why couldn't you expect them to be making an argument? In fact, they are making the argument that the threat is implicit. There is a threat there that if you come to the table, this, we won't be causing trouble. But if you don't come to the table, we're going to just, we're going to bring the law down on you. Like I'm coming, I'm, you know, it's that old line from Tombstone. You tell them I'm coming and hell's coming with me. I've never seen the movie. I've got to go watch Tombstone. If acting as a whistleblower without offering to withhold the whistleblowing can be sufficient evidence to put someone in jail for 20 years, that would have an extraordinary, that would be far worse than had Nora Pennington come out the other way. There was no allegation that the union did not believe that those allegations were sound. There was no allegation that those allegations. That's irrelevant. That's irrelevant whether they thought they were sound or not. Whether they wanted to use it as a bargaining chip. What Ms. Alito was telling us is they picked CARE 1 because they thought they are susceptible to pressure on this. Not because they thought we're good citizens and we want to wipe out Medicare fraud, but because they said, these guys, we can tell, in a multitude of ways without ever saying it to them, that they're in trouble and they're going to be in big trouble if they don't come to the table. Now that occurs to me to be typically the sort of thing that a jury answers the question. They say, we don't believe that that was what they were doing, but a fact finder does that. I disagree. The lesson of Nora Pennington and all of its progeny, including right up to, and we could submit a letter on this on the right to petition, including the BE&K construction case. All of those cases say, in BE&K construction, the shoe was on the other foot. An employer brought a piece of litigation that looked to the whole world as if it was only brought because the union had successfully brought some unfair labor practice charges and was making progress in the labor dispute. The Supreme Court said, it does not matter what the motive is. If that petition was sound and the employer believed that it had a chance of succeeding, it is as a matter of law outside the sham exception. You've got two questions. You've got two factual issues in that presentation. I don't think there is a fact issue there because the sham question can and often is decided as a matter of law. It was decided as a matter of law in Nora itself. It was decided as a matter of law in the BE&K case. Well, if the intent is only to use the process to effectuate a certain result and not to vindicate the underlying claim, Medicaid fraud, it seems to me that is exactly what Nora Pennington is aimed. That's the carve out, that if you invoke the process, not because you want to vindicate Medicaid fraud, but just to use the process as leverage and you don't give a damn whether or not the claim is meritorious or not. Isn't that exactly the carve out in Nora Pennington? And isn't that a jury question? Not if, not unless there is some evidence that the petitioner believed that the petition would not succeed. The motive becomes relevant. That's the lesson of those cases. The motive, exactly. The motive becomes relevant only if, the only if is the key. The motive becomes relevant only if the petition isn't well grounded in fact. It's objectively baseless is the language. It's objectively, and there was no proof that there was an objectively baseless charge made here. There was no proof of that. And the evidence, when Mr. Pickus testified in his deposition that he hoped that it would succeed, that he hoped that the government would act, that was the antithesis of a Nora Pennington, of bad behavior under Nora Pennington. That was, I hope this succeeds. That wasn't, I hope it just sits there as a hammer. And everyone who testified What do we make, hold on, what do we make of the assertion by the other side that this wasn't just aimed at CARE 1, that the statement, we're gonna turn your healthcare facilities into pizza parlors. We're driving you out of this state was really a larger aim by the unions to send messages to other companies that this was, it may have been the case that they thought, we'll take this one down. That's all right. But this is part and parcel of our way of signaling to the next business. We'll destroy you. And that's okay. We'll just destroy you. And then the next one, we won't have to burn the next village down because we burned this one down and they'll all get the message. So under, there is nothing inappropriate. Let me put it this way. And this is important. There's nothing extortionate. And the Supreme Court's cases from Scheidler through Sekar, the Supreme Court has been very careful and Edmonds running before Sekar. Those cases tell a very important lesson. And the lesson is that extortion is a very specific kind of crime that isn't supposed to be charged just because you don't like the conduct or find it distasteful. Often- No, no, no. And I hope I'm not sending, I hope that's not what I'm getting at. I hope you don't think that we're thinking, ooh, icky union. I mean, that's not the point. The point is to try to get you to address the other side's argument that there is behavior here which a jury should look at because a jury could look at this and say, when a union official says, we will wipe you out. We'll turn your business into pizza parlors. And they say on the record, there's evidence. This is a message to everybody that that is something a jury can look at. They, a jury should look at that and say, you know what? I think that's extortion. What's wrong with that argument? What's wrong with it is it is flatly inconsistent with the United States Supreme Court's decision in Shidler where the facts were that a right-to-life group that resorted to violence and blocking of entrances to an abortion clinic for the express purpose undisputed of shutting down the clinic was not engaged in extortion but may have been engaged in the different non-RICO predicate crime of coercion. So there are different crimes and different torts. And this is not the appropriate fit. Extortion is not the appropriate crime if any crime is to be charged at all. And by the way, there's no evidence that any of what the unions did here was even a tort. So if you're concerned about the broad implications, you can look at the conduct here. But on the issue of destroying the business, that's under Shidler, that cannot be extortion. It's right on point. And I just want to say, it can't be extortion to tell you I'm going to destroy your business. That can't be extortion. That's an extraordinary statement. A union for every strike, every single strike, and this is why I bring it back to labor relations, and every single strike, the message is that we are hoping that your vendors don't come in. We're hoping that your workers don't cross the picket line. We are hoping that the rest of the world isolates you. True enough, and this isn't a strike. So none of that has any relevance to what we're talking about right here. But the argument that's being made to us is not these people engaged in strike behavior that went too far. The argument that's being made is these people did things which have nothing to do with ordinary labor kind of relations. These were pressure tactics which are outside the law. That's the argument. These are pressure tactics that are used by labor organizations, by civil rights organizations. These are basically calls for economic boycotts. Any successful boycott threatens to put a business out. I don't want to get too into the weeds of the facts, but on the pizza parlor thing, that was made in the context of the company itself closing its nursing homes one by one to put pressure on the union. And Mr. Pickett just said, you know, it's up to you how you operate your business. You can turn them into pizza parlors. So I don't want to get into the weeds of the facts on that. But since it's been a theme here, if you look at the record and the context, it's not a threat to turn anyone into a pizza parlor. It's a statement of the company's rights, when they're closing their homes, to get leverage against the union. So, you know, I think the Supreme Court said in Lynn, in the Lynn case, that labor disputes are vituperative affairs. They're often unpleasant. Both sides resort to, you know, aggressive tactics. But here, if there's no resort to violence, there is no threat to engage in any kind of classic blackmail, which is the revealing of a personal secret. All that was threatened to Mr. Strauss implicitly or explicitly through the protests at NYU were that you have a reputation, you know, you have a reputation maybe for endowing an Institute of Public Justice. And we're going to point out public facts. Every single fact in those flyers was a public fact. The general counsel of the NLRB brought charges. The NLRB agreed with the general counsel. Every fact was just drawn from public records. There was no effort to sort of pry into his personal life. That's why the UBC case is on point. Judge O'Scanlan carved out, you know, true blackmail, you know, the kind that you might see in a soap opera where the person, you know. We get it. We know there weren't pictures of Mr. Strauss with people he shouldn't be with. We understand that. It was all an effort to publicize problematic behavior. And that is protected activity. You are way over at this point. I'm not quite sure how far we're going to get over. So let me just let you there. We've read the briefs. They're both excellent briefs and we'll take it into advisement. Ms. Alito, so much was said there by Mr. Dian. Rather than opening up the whole debate again, I would invite you to send to respond to any of the things that you just heard that you feel you won't be able to respond to because of the absence of preserving time for a bottle. And we'll certainly take a long hard look at that. I'm sorry, any more questions, either of my colleagues? I should have asked that before I cut off Mr. Dian. No. Can't you? Okay. No. Thank you very much. Thanks to all counsel. Yeah. Thank you very, very much for a very vigorous and very skillful presentation. Thank you. We'll take the matter into advisement.